UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-81598-CIV-MARRA

CLARA ALVARADO,

Plaintiff,

vs.

BOCA RATON COMMUNITY HOSPITAL,
a Florida corporation,

Defendant.
_____/

## OPINION AND ORDER

This cause is before the Court upon Defendant Boca Raton Community Hospital's

Motion for Summary Judgment (DE 14) and Defendant's Motion to Strike Declaration of Maria

Duque (DE 35).  The motions are fully briefed and ripe for review.  The Court has carefully

considered the motions and is otherwise fully advised in the premises.

I.  Background

The facts, as culled from affidavits, exhibits, depositions, answers, answers to

interrogatories and reasonably inferred therefrom in a light most favorable to the non-moving

party, for the purpose of this motion, are as follows:

Plaintiff Clara Alvarado ("Plaintiff") was born in Peru on September 19, 1947. (Alvarado

Dep. 6, 10.)  Plaintiff identifies her race as Latino/Mestiza or Hispanic. (Alvarado Dep. 11, 59.)

Plaintiff was hired by Boca Raton Community Hospital ("Defendant") in April of 2004 as a

registered nurse. (Alvarado Dep. 20, 22.)  When Plaintiff was hired, she received training on the

Hospital A+ Standards of Excellence regarding customer service and patient care, and

understood that those standards applied to her. (Alvarado Dep. 24-25.)  Plaintiff signed an acknowledgment that she understood the A+ Standards of Excellence and that compliance with the standards was a condition of her employment with Defendant. (Alvarado Dep. 25-26.) Plaintiff's job duties included communicating effectively with patients, patients' family members and other hospital staff. (Alvarado Dep. 44-45.)

From nearly the beginning of her employment in 2004 until March of 2008, Plaintiff's direct supervisor was Puanani Cooper, who served as Director of the Intensive Care Unit ("ICU"). (Alvarado Dep. 22-23; Cooper Decl. ¶ 2.)  According to Ms. Cooper's declaration, during the time that Plaintiff was a charge nurse, she was aware that Plaintiff had problems communicating with staff, patients and their families.  She received a number of complaints from staff nurses in the ICU about Ms. Alvarado's treatment of them, including that she was a "control freak" and changed nursing assignments at the last minute.  (Cooper Decl. ¶ 4.)  In addition, Plaintiff was frequently tardy, which caused problems with shift change activities.  (Cooper Decl. ¶ 5.)  On November 11, 2005, Ms. Cooper issued Plaintiff a written warning and placed her on a 60-day probation for failing to adhere to Defendant's attendance policy by being tardy 74 times within the previous 12 months.[1] (Cooper Decl. ¶ 5; Alvarado Dep. at 62-63; November 11, 2005 Progressive Disciplinary Action Form, Ex. 10 to Alvarado Dep.)

Plaintiff's 2005 performance evaluation issued by Ms. Cooper stated that Plaintiff is a "bright and capable critical care nurse," "a skilled clinician," who is "always calm and professional."  In addition, the evaluation stated that her patients view her as "confident and

---

[1] Plaintiff points to her deposition testimony stating that nurses who were in school were accommodated.  However, Plaintiff's testimony simply explains that she would try to accommodate the schedule of nurses attending school. (Alvarado Dep. at 59.)

caring" and that she "works well with her peers exhibiting good teamwork." The performance evaluation did state that "tardiness remains an issue." (2005 Performance Evaluation, Ex. 7, DE 23.) Plaintiff's 2006 performance evaluation stated that Plaintiff would be promoted to a full time charge nurse position, but that she must ensure that she continues to adhere to the time and attendance policy. (2006 Performance Evaluation, Ex. 8, DE 23; Human Resource Action Form, Ex. 11, DE 23.) Ms. Cooper selected Plaintiff for the charge nurse position around April of 2006 due to Plaintiff's experience as a nurse and based on her master's in health care and her desire to enter nursing supervision. (Cooper Decl. ¶ 3.) During the time she was charge nurse, Ms. Cooper received several complaints from staff nurses, but Plaintiff testified that Ms. Cooper never told her about the complaints by other nurses or staff members. (Cooper Decl. ¶ 4; Alvarado Dep. 59-60.) The only complaints Plaintiff knew about concerned nurses' dislike of assignments that were made in response to the hospital's understaffing problems. (June 10, 2008 Letter from Plaintiff to Julie Hilsenbeck, Ex. 5, DE 23.)

Ms. Cooper stated that she received complaints that employees did not want to work with Plaintiff because she showed favoritism and micromanaged them. At least one employee asked not to work on days when Ms. Alvarado was assigned as a charge nurse. (Cooper Decl. ¶ 6.) Tim McKinney, R.N., who had twenty years of nursing experience, transferred out of the ICU because of Plaintiff's treatment of staff nurses and treatment of patients and their family members. (McKinney Aff. ¶ 5.) An agency nurse, from a temporary staffing agency, complained that she did not want to return to work at the hospital if she had to work with Plaintiff. (Cooper Decl. ¶ 6.)

Ms. Cooper claims that she counseled Plaintiff on a number of occasions concerning her

3

relationships with subordinates, communication issues and rudeness to patients in the hope that Plaintiff would improve. (Cooper Decl. ¶ ¶ 10- 11.)   Despite Ms. Cooper's counseling, the hospital continued to receive complaints from patients and their family members about Plaintiff's communication issues and rudeness to patients. (Cooper Decl. 11-12.)  Plaintiff thought Ms. Cooper was a fair director. (Alvarado Dep. at 23.)

On one occasion, Ms. Cooper received a complaint from a patient's family member after Plaintiff attempted to explain the patient's condition of congestive heart failure to the patient's daughter by comparing the patient's condition to a toilet getting clogged up and backing up. The daughter sent a complaint regarding Plaintiff's conduct to the Hospital. Ms. Cooper counseled Plaintiff that while her description of the patient's condition in comparison to a toilet backing up might be technically accurate, it was an inappropriate analogy and insensitive to the needs of the patient and her daughter at a difficult time period. (Cooper Decl. ¶ 8.)  Plaintiff points out that the families of ICU patients are often under a great deal of stress. (Alvarado Dep. at 45; Newton Dep. at 26.)  In fact, the most common form of complaints made against nurses concern personality. (Newton Dep. at 26.)

In February of 2007, the hospital received a complaint about Plaintiff by a priest who was visiting a patient.  Plaintiff treated the patient in a rude and unprofessional manner by telling him to leave the patient's room because "it was not convenient," even though the priest showed Plaintiff his hospital identification. Ms. Cooper spoke to Plaintiff regarding her interaction with the priest and how she was perceived in a negative manner, and that Plaintiff should be aware of people's perceptions. (Cooper Decl. ¶ 9; Alvarado Dep. at 66, 106; Ex. 12, February 26, 2007 Patient Complaint/Grievance Action Form, attached to Alvarado Dep.)

4

Plaintiff testified that Ms. Cooper only provided her with "general" comments about being aware of other people's perceptions, but nothing "specific."  (Alvarado Dep. at 107.) Plaintiff testified that sometimes she is "loud," "expressive" and "direct." (Alvarado Dep. at 59-60, 73.)

In March of 2008, Ms. Cooper was reassigned from her position as Director of ICU to another position within the hospital. She was replaced on a temporary basis by Cheri Roberson. Ms. Roberson also served as the Director of Cardiovascular Services.  Although Ms. Cooper was no longer the ICU Director, she continued to work on the fourth floor near the ICU staff.  Ms. Cooper continued to receive numerous complaints and comments from the nursing staff in the ICU that Plaintiff was more difficult to deal with after Ms. Cooper left the director position. Staff members told Ms. Cooper that Plaintiff was completely "out of control." Ms. Cooper felt that Plaintiff had regressed in whatever progress she had made under Ms. Cooper's counseling and tutelage regarding her manner of dealing with staff and patients.  (Cooper Decl. ¶ 12.)

On March 30, 2008, Plaintiff's performance evaluation praised her technical skills but criticized her "abrupt communication style" which "causes her to be perceived as uncaring and sometimes as unnecessarily controlling."  Ms. Roberson signed the evaluation as Plaintiff's supervisor, Melissa Durbin signed the evaluation as the department leader, and Lauren Madden signed the evaluation as a member of the human resources department.  (March 20, 2008 Performance Evaluation, Ex. 13 to Alvarado Dep.)

On May 10, 2008, Ms. Durbin became the Executive Director of the Hospital's Critical Care Units. (Durbin Decl. ¶ 2.)   Ms. Roberson prepared a memorandum to Ms. Durbin detailing numerous problems that Plaintiff had experienced in supervising her staff and numerous

complaints about Plaintiff by her staff.  Ms. Durbin worked with Plaintiff at another hospital

prior to the employment of either of them by Defendant, and she was aware that Plaintiff had

similar issues regarding communication style, patient complaints and staff complaints while at

that other hospital. (Durbin Decl. ¶ 6.)  Plaintiff disputes that she had similar problems at the

other hospital. Instead, she states that Ms. Durbin treated her with disdain, was "overly pleasant"

with Caucasian nurses and had a pattern of removing nurses she did not like. (Alvarado Decl. ¶¶

10-11.)

In or around May of 2008, Carol Korbar was appointed as Director of ICU to replace Ms.

Cooper. (Korbar Decl. ¶ 1; Cooper Decl. ¶ 2.)  At her first staff meeting, Ms. Korbar was

presented with multiple complaints by staff against Plaintiff. (Korbar Decl. ¶ 3.)  The specific

complaints Ms. Korbar received upon accepting the position of Director of ICU were the

following:

(a) On May 28, 2008, a patient's family registered two separate complaints against

Plaintiff regarding the "abruptness and anger" she displayed, stating the patient felt

"scared and unsafe" in Plaintiff's presence.

(b) On May 30, 2008, an agency nurse filed a complaint about Plaintiff stating she did not

want to return to work at the hospital due to her interactions with Plaintiff.  The nurse

stated that she went down to a test with another patient and asked Plaintiff to watch over

her confused patient, and upon returning, the patient was in disarray with all his lines and

tubes pulled out. Plaintiff later told the nurse to "stop complaining, I can make you

DNU," meaning that the nurse would no longer be given assignments at the hospital.

(c) On June 1, 2008, a nurse from CVICU complained that Plaintiff was rude, nasty and

6

unprofessional.

(d) On June 4, 2008, Ms. Roberson called the ICU to ensure adequate staffing in the

CVICU. Plaintiff sent Ms. Roberson a disrespectful message that the ICU nurses were

just as capable to take care of the patient as the CVICU nurses.

(June 6, 2008 Progressive Disciplinary Action Form, Ex. 14, attached to Alvarado Dep.; Korbar

Decl. ¶ 4.)

 Plaintiff states that she did not sign the progressive disciplinary action form that laid out

these incidents because the meeting was "negative" and she believed she was being discriminated

against. At one point, Plaintiff asked to see the complaints, but was told by Ms. Durbin that she

was not entitled to see them.  (June 10, 2008 Letter from Plaintiff to Julie Hilsenbeck, Ex. 5.)

Plaintiff did admit that a patient complained about her on two separate occasions in May of 2008.

(Alvarado Dep. at 120.)

As a result of these patient and staff complaints, Ms. Korbar decided that she needed to

take "immediate control" of the situation. On June 6, 2008, Ms. Korbar removed Plaintiff from

her charge nurse role, demoted her to a staff nurse position, and suspended her with a warning

that future non-compliance with the hospital's standards of conduct towards staff and patients

would result in further disciplinary action, up to and including termination. (Korbar Decl. ¶ 5;

June 6, 2008 Progressive Disciplinary Action Form, Ex. 14.)

Plaintiff testified that during this meeting, Ms. Korbar told her that maybe if she smiled

more, the patients and nurses would feel more comfortable with her. (Alvarado Dep. at 114.)

Prior to this meeting, Plaintiff claims she did not receive any complaints from patients. (Alvarado

Dep. at 38.)  Plaintiff testified that if the five incidents for which she was demoted on June 6,

2008 actually happened, such actions would be a violation of Defendant's A+ Standards of Excellence, and that the person should be demoted and should not remain a charge nurse. (Alvarado Dep. at 126.) Plaintiff states that Horace Atkins was a Caucasian male who did not get disciplined when he received patient complaints. (Alvarado Decl. ¶ 5.) Another nurse, Susan Denson, received no discipline for not reattaching an insulin IV to a patient. (Alvarado Decl. ¶ ¶ 3, 6.) Another nurse, Stephanie Miquelli, a white female, had received patient complaints for being rude, yet not disciplined.[2] (Alvarado Decl. ¶ ¶ 7-8.)

On June 10, 2008, Plaintiff wrote a letter to Julie Hilsenbeck, Vice President of Patient Care for the hospital, regarding the meeting on June 6, 2008 wherein she was demoted. In that letter, she stated "I believe I was being discriminated against." (June 10, 2008 Letter from Plaintiff to Julie Hilsenbeck.) On that same date, Plaintiff also wrote a letter to Richard Van Lith, President and CEO of the hospital, to complain about a meeting she had with Ms. Durbin, Ms. Korbar, Ms. Roberson, Dianne Goatley (Director of Employee Relations) and Ms. Hilsenbeck regarding the June 6, 2008 discipline. While the letter did not specifically mention age, national origin or race, the letter states the Ms. Durbin used "discriminatory tactics" against Plaintiff. The letter explained that Ms. Durbin worked with Plaintiff at another facility and used "the same tactics as she is using today to discriminate against me." The letter also stated that Ms. Durbin is "continuing to discriminate against my person as she did in her previous facility." (June 10, 2008 letter from Plaintiff to Richard Van Lith, Ex. 16, attached to Alvarado Dep.)

---

[2] Ms. Newton also testified that a grievance was filed against a nurse for hitting a patient, but she did not know what happened to that nurse. (Newton Dep. at 60.) Also, there was a patient complaint against Plaintiff in which other nurses were implicated, but Ms. Newton did not know whether these other nurses were disciplined. (Newton Dep. at 59.)

At various times, Plaintiff met with Mindy Raymond, the Vice President of Human Resources. (Alvarado Dep. at 168-69, 172.)   Following these meetings, Ms. Raymond, along with Ms. Hilsenbeck, conducted an investigation into Plaintiff's complaints of unfair treatment. Ms. Raymond determined that actions taken by Plaintiff's supervisors were "in response to documented patient complaints about the care provided and the rudeness of [Plaintiff]" and Plaintiff "was not treated any differently than any other nurse would have been if they would have engaged in the same conduct." (Raymond Decl. ¶ 7.)

Subsequently, on July 22, 2008, a patient's daughter complained to RN Case Manager Susan Davis that Plaintiff was rude to her father.  The patient's daughter stated she was pleased with the nursing care her father had received from five of the nurses, with the exception of Plaintiff.  This grievance was written up by Patient Advocate Renee Newton. (July 22, 2008 Patient Complaint/Grievance Action Form, Ex. 18, attached to Alvarado Dep.)[3]  Plaintiff does not believe that Ms. Newton was misinterpreting or fabricating the nature of this complaint, and does not think Ms. Durbin caused the patient's daughter to complain. (Alvarado Dep. at 185-86, 188-89.)  On July 28, 2008, Plaintiff was issued a three day suspension for this incident.  (July 28, 2008 Progressive Disciplinary Action Form, Ex. 19, attached to Alvarado Dep.)  A meeting was held to discuss this incident leading to her suspension, and Plaintiff was told and understood that any further noncompliance with the A+ Standards would result in termination. (Alvarado Dep. at 192-93.)  Plaintiff characterizes this meeting as part of Ms. Durbin's attempt to "create a paper trail of patient and staff complaints" against her which were Ms. Dubin's tactics when

---

[3] The grievance noted that the patient ripped out his IVs but the patient's daughter "doesn't blame anyone for this." ((July 22, 2008 Patient Complaint/Grievance Action Form.)

9

Plaintiff worked with her at another facility. (Alvarado Decl. ¶ 10.)

Less than a month later, on August 27, 2008, a patient in the ICU and his wife complained that Plaintiff was not pleasant, would not give the patient's wife any information, and would not let the patient's wife finish her sentence before Plaintiff would interrupt her. Plaintiff was suspended for five days based on this complaint. (September 5, 2008 Progressive Disciplinary Action Form, Ex. 21, attached to Alvarado Dep.)   Plaintiff did not sign the progressive disciplinary action form because she did not agree with the accusation. (Alvarado Dep. at 212.)  Plaintiff understood that she had to make immediate and sustained improvement in communication skills with patients, family and staff. (Alvarado Dep. at 212.)

On February 11, 2009, one of the hospital's patient advocates, Phyllis Snell, received a complaint from a patient that Plaintiff was "miserable," would not assist him with eating and curtly stated "you are going to have to learn how to do it yourself."  In addition, she told the patient that she was too busy to get him some water, and rolled the patient in such a rough manner that he was banged into the bed rail. (February 11, 2009 Patient Complaint/Grievance Action Form, Ex. 22, attached to Alvarado Dep.)

On February 18, 2009 Ms. Korbar and Ms. Raymond met with Plaintiff to notify her that her employment was being terminated based on the actions which led to the February 11, 2009 patient complaint.  Plaintiff had already received a final warning in her counseling session on July 28, 2008, wherein she was advised that any further noncompliance with the A+ Standards would result in termination. (Alvarado Dep. at 220-221; February 18, 2009 Progressive Disciplinary Action Form, Ex. 23, attached to Alvarado Dep.)  Plaintiff admitted that if a nurse did the things complained of in the February 11, 2009 grievance form, such actions would be a

violation of the hospital's practices and standards. (Alvarado Dep. at 217.)

Plaintiff testified in her deposition that termination would be justified if a nurse had been written up five or six times for patient complaints of failing to meet the hospital's standards of excellence. Plaintiff is not aware of any nurse at the hospital that had committed five or six documented violations who was not terminated. (Alvarado Dep. at 217-18.)  According to Ms. Korbar, no other charge nurse who worked in the same department as Plaintiff was accused of as many violations of the hospital's polices as Plaintiff. (Korbar Decl. ¶ 16.) In addition, the hospital received more complaints about Plaintiff's behavior and treatment towards the patients and nurses than any other nurse in Plaintiff's department.  (Korbar Decl. ¶ 13.)  Plaintiff states in her declaration that she believes the records produced are not complete because Susan Denson and Horace Atkins had other complaints lodged against them. (Alvarado Decl. ¶ 6.)

Ms. Durbin states that she did not discriminate against Plaintiff on the basis of race, national origin, age or in retaliation for her raising complaints of unfair treatment. (Durbin Decl. ¶ 12.)  Ms. Korbar attests that each of Plaintiff's disciplinary write-ups and suspensions were solely the result of the complaints the hospital received about her; it was Plaintiff's actions that led to those complaints; and the disciplinary write-ups and suspensions Plaintiff received were not based upon her race, national origin, age or her complaints of unfair treatment. (Korbar Decl. ¶ 14.)  Ms. Korbar also states that Plaintiff was not treated any differently than any other nurse who had engaged in the same type of conduct as Plaintiff. (Korbar Decl. ¶ 15; see also Raymond Decl. ¶ 7.)  In light of the numerous complaints against Plaintiff and her failure to improve her behavior following her final warning, Ms. Raymond and Ms. Korbar made the decision to terminate Plaintiff's employment. (Raymond Decl. ¶ 12; Korbar Decl. ¶ 11.)  According to Ms.

11

Raymond and Ms. Korbar, the decision to terminate Plaintiff was not related to Plaintiff's race, national origin, age or in retaliation for her raising complaints to the hospital. (Raymond Decl. ¶ 15; Korbar Decl. ¶ 18.) Although Ms. Korbar reported to Ms. Durbin that she had received complaints about Plaintiff, Ms. Durbin did not become involved in the matter and was not involved in the decision to demote, suspend or terminate Plaintiff. (Durbin Decl. ¶¶ 7-8, 11.)

In contrast, Plaintiff believes that Ms. Durbin did not like Hispanics and was much friendlier with non-Hispanic Caucasian nurses. (Alvarado Decl. ¶¶ 13.) In addition, Plaintiff believes that Ms. Durbin discriminated against her in the same manner as she had when they worked at the facility in Delray. (Alvarado Decl. ¶ 14.)

On August 11, 2008, Plaintiff filed a charge of discrimination. With respect to the boxes on the form, Plaintiff checked that the discrimination was based on "age" and "national origin." The charge also stated that Plaintiff believed she was discriminated against because of "national origin/Hispanic" and "age/60." In addition, Plaintiff noted that she had been suspended for three days. (Discrimination Charge, Ex. 4, attached to DE 23.) The Right to Sue letter from the Equal Employment Opportunity Commission ("EEOC") is dated May 20, 2009. (Right to Sue Letter, Ex. A, attached to Compl.) Plaintiff has submitted an envelope from the EEOC. (Envelope, Ex. 4, DE 23.) Plaintiff states in her declaration that after she filed her case with the EEOC, she never received "any correspondence as follow up" to her claim and, after several months passed, she called the EEOC. (Alvarado Decl. ¶¶ 22-23.) Plaintiff was out of the country on May 20, 2009. Plaintiff did not notify the EEOC that she was going to be out of the country, and she did not forward her mail. (Alvarado Dep. at 236, 238.) Plaintiff's passport shows that she was in Germany from May 13, 2009 to May 25, 2009. (Passport Pages, Ex. 7, DE 15.)

In moving for summary judgment, Defendant contends that Plaintiff's claims brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA") must be dismissed for failure to file her complaint within 90 days of receipt of the EEOC Right to Sue Letter.  With respect to her claims for race discrimination brought pursuant to Title VII and the Florida Civil Rights Act, Defendant asserts that Plaintiff failed to file a race discrimination charge with the EEOC and the Florida Commission on Human Relations.  Regarding the race and national origin claims, Defendant argues that Plaintiff cannot establish her prima facie case; namely, that she cannot establish that she was treated differently than similarly situated employees outside of the protected class. In addition, Defendant states that it had legitimate, non-discriminatory business reasons for demoting and terminating Plaintiff's employment and Plaintiff cannot establish pretext.  Regarding the hostile work environment claims, Defendant contends that Plaintiff has not alleged any comments or behavior based upon her race or national origin.  Defendant argues that the Title VII retaliation claim is barred because of Plaintiff's failure to include the claim in her charge, and that Plaintiff cannot establish a prima facie case of retaliation under Title VII and 42 U.S.C. § 1981.  Even if she could, Defendant contends that it had a legitimate reason for disciplining and terminating Plaintiff, and Plaintiff cannot establish pretext.  Finally, with respect to the age discrimination claim, Defendant states that Plaintiff cannot establish a prima facie case, that it had a legitimate non-discriminatory reason for its actions and Plaintiff cannot establish pretext.

13

II.  Summary Judgment

The Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c).  The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323.  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  According to the plain language of  Fed. R. Civ. P. 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but instead must come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.

14

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. Anderson, 477 U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted."  Anderson, 477 U.S. 242, 249-50.

III.  Discussion

A.  90-day Filing Requirement

Defendant moves to dismiss the Title VII and ADEA claims on the basis that Plaintiff failed to file her Complaint within 90 days of receipt of the EEOC's right to sue letter.  The parties agree that claimants are required to file a complaint within 90 days after a claimant has adequate notice that the EEOC dismissed the charge, and that Plaintiff bears the burden of establishing that she met this requirement.  See 42 U.S.C. § 2000e-5(f)(1)(Title VII); 29 U.S.C. § 626(e)(ADEA); Santini v. Cleveland Clinic Florida, 232 F.3d 823, 825 (11th Cir. 2000); Zilllyette v. Capital One Fin. Corp., 179 F.3d 1337, 1339 (11th Cir. 1999).

According to Plaintiff, she received the Notice from the EEOC on August 9, 2009, even though it was dated May 20, 2009.  Plaintiff filed her Complaint on October 29, 2009.  The record evidence relied on by Plaintiff is a photocopy of an envelope with the return address of the EEOC.  Plaintiff has not provided any sworn evidence that the Notice was sent in this envelope.[4]

_____

[4] The Court has examined this envelope and notes that while the photocopy is poor, the postmark date of the month of "August" can be discerned.

Of course, "[t]o be admissible in support of or in opposition to a motion for summary judgment, a document must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e)" Saunders v. Emory Healthcare, Inc., 360 Fed. Appx. 110, 113 (11th Cir. 2010) (holding that because exhibits were not properly authenticated, the district court was not required to consider them in opposition to the defendant's motion for summary judgment.) (citation omitted). In addition, Plaintiff argues that there is no evidence that the EEOC mailed the Notice in May.  Furthermore, Plaintiff states in her declaration that after she filed her case with the EEOC, she never received "any correspondence as follow up" to her claim and, after several months passed, she called the EEOC.[5] (Alvarado Decl. ¶ ¶ 22-23.)

In moving for summary judgment, Defendant contends that the evidence shows Plaintiff was out of the country on May 20, 2009, she did not notify the EEOC that she was going to be out of the country and she did not forward her mail. (Alvarado Dep. at 236, 238; Passport Pages.) Clearly, in making this argument, Defendant presumes that the Notice was mailed to Plaintiff in May of 2009, and that Plaintiff failed to ensure that she received all mail delivered while she was out of the country.

The Eleventh Circuit has held that a plaintiff has "a minimal responsibility" in the resolution of her claims and applies a "a case-by-case approach in determining what constitutes receipt and when the time is triggered." Zillyette v. Capital One Fin. Corp., 179 F.3d 1337, 1340-41 (11th Cir.1999) citing Lewis v. Conners Steel Co., 673 F.2d 1240 (11th Cir.1982);

---

[5] Plaintiff's response also states that she told the EEOC that she never received the Notice and the EEOC told her that they would resend it. However, Plaintiff has not provided a record citation supporting this contention.  The Notice is attached to the Complaint.  Presumably, then, Plaintiff received the Notice.

Stallworth v. Wells Fargo Armored Services Corp., 936 F.2d 522, 524 (11th Cir.1991).  For example, when a claimant has reason to know she received mail from the EEOC regarding her case, she has a "minimal responsibility" to obtain the letter and act upon it in a timely manner. Compare Zillyette, 179 F.3d at 1431 (claimant bore minimal burden of retrieving EEOC's right-to-sue letter in a timely manner following postal services' first attempt to deliver it); Law v. Hercules, Inc., 713 F.2d 691 (11th Cir. 1983) (dismissing suit on timeliness grounds when the plaintiff's seventeen-year old son picked up the EEOC letter at the post office at the directive of the plaintiff's wife and left it on the kitchen table); Bell v. Eagle Motor Lines, Inc., 693 F.2d 1086 (11th Cir. 1982) (finding 90-day period for filing suit began to run when the plaintiff's wife received the letter at their shared place of residence) with Lewis v. Conners Steel Co., 673 F.2d 1240 (11th Cir. 1982) (remanding to district court to make factual findings to determine if events beyond the plaintiff's control intervened and through no fault of his own failed to receive the suit letter); Franks v. Bowman Transportation Co., 495 F.2d 398 (5th Cir. 1974),[6] rev'd on other grounds, 424 U.S. 747 (1976) (reversing dismissal of the plaintiff's suit based on fact that the EEOC's notification letter was lost by the plaintiff's nine-year old nephew).

The Court finds there are factual questions regarding whether Plaintiff received the Notice from the EEOC.   At the summary judgment stage, Defendant must point to evidence demonstrating that Plaintiff knew she received a letter from the EEOC in May 2009 and failed to act upon it.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (the defendant

---

[6] The decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

must point to "materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden."). Defendant has not done so. Instead, Defendant relies upon evidence that Plaintiff was out of the country in late May of 2009 and asks the Court to infer that Plaintiff knew the letter was sent by the EEOC in May of 2009. Unlike the cases highlighted supra, Defendant has not demonstrated receipt of the Notice. See, e.g., Zillyette, 179 F.3d at 1431; Law v. Hercules, Inc., 713 F.2d at 692-93; Bell, 693 F.2d at 1087. Moreover, Plaintiff has stated that she never received any correspondence from the EEOC. Based on this record, the Court concludes that summary judgment on the issue of timeliness is not warranted.

### B. Failure to Exhaust Administrative Remedies on Title VII and FCRA Race Discrimination Claim

Defendant moves for summary judgment on Plaintiff's Title VII and FCRA race discrimination claims based on Plaintiff's failure to assert a race discrimination claim in her administrative charge of discrimination. Defendant notes that the administrative charge had several boxes to check and Plaintiff checked "age" and "national origin," but not "race."

To be sure, a charge of discrimination must be filed with the EEOC as a condition precedent to bringing a Title VII and FCRA action. Chandra v. Engelhard/ICC, 234 F.3d 1219, 1225 (11th Cir. 2000). Moreover, "[a] Title VII action, however, may be based not only upon the specific complaints made by the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination." Id.

Here, while Plaintiff's charge did not check the box "race," the narrative portion of the

18

charge states "I believe I am being discriminated against because of my national

origin/Hispanic."  By using the term "Hispanic," the EEOC was put on notice to investigate her

claims of race discrimination. See Bravo v. American Honda Finance Corp., No. 3:10-cv-64,

2010 WL 2572862, at *2 (W.D.N.C. Jun.24, 2010) (finding that "race" and "national origin" are

reasonably related when plaintiff may have been unsure of whether to classify Hispanic as "race"

or "national origin" and thus, failed to check the box "race" on her EEOC charge, but was

adamant in the charge that she was discharged because of her Hispanic nationality); Torres v.

City of Chicago, No. 99 C 6622, 2000 WL 549588, at * 2 (N.D. Ill. May 1, 2000) (noting that

while the term "Hispanic" does not literally designate either race or national origin, it is

understood to imply both and therefore found that EEOC could be expected to investigate race

claim based on allegation in EEOC charge of national origin discrimination).[7]  Furthermore, the

---

[7] Moreover, courts have observed that the line between race and national origin is an "extremely difficult one to trace." Bullard v. Omi Georgia, Inc., 640 F.2d 632, 634-35 (5th Cir. 1981); see Saint Francis College v. Al-Khazraji, 481 U.S. 604, 614 (1987) (Brennan, J. concurring) (stating that race discrimination and national origin discrimination are often "identical as a factual matter [where] one was born in the nation whose primary stock is one's own ethnic group."); Von Zuckerstein v. Argonne Nat'l Lab., 984 F.2d 1467, 1472 (7th Cir.1993) ("Certainly, the line between national origin and race or ethnicity . . . cannot be bright."); Alonzo v. Chase Manhattan Bank, N.A , 25 F. Supp. 2d 455, 460 (S.D.N.Y 1998) (concluding that race discrimination was reasonably related to national origin claim "[d]ue to [plaintiff's] pronouncement that he was discriminated against because he is a Hispanic, because it has not been established that the designation of being a Hispanic precludes a claim of racial discrimination, and given the uncertainty among courts as to whether 'Hispanic' is better characterized as a race or national origin."); Enriquez v. Honeywell, Inc., 431 F. Supp. 901, 904 (W.D. Okla. 1977) (explaining that "[t]he fact is the line between discrimination on account of race and discrimination on account of national origin may be so thin as to be indiscernible."); Cubas v. Rapid American Corp., 420 F. Supp. 663, 666 n.2 (E.D. Pa. 1976)(asserting that "[w]e are not aware of an authoritative and judicially manageable method for distinguishing between national origin discrimination and racial discrimination when both may be present at the same time.").

evidence remains the same with respect to both the national origin and race discrimination

claims, thus any investigation by the EEOC into either race or national origin discrimination

would have revealed the same evidence.  For the foregoing reasons, the Court denies Defendant's

motion for summary judgment on this basis.

     C.  Disparate Treatment/Race and National Origin Claim

     In order to establish a prima facie case of disparate treatment under Title VII,  the FCRA,

and section 1981, a plaintiff may establish a prima facie case of discrimination through

circumstantial evidence under the framework set forth in McDonnell Douglas Corp. v. Green,

411 U.S. 792, 802-804 (1973); see Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir.

2004); Holifield v. Reno, 115 F.3d 1555, 1561-62 (11th Cir. 1997).[8]

     Under that framework, the plaintiff must "create an inference of discrimination through

[her] prima facie case." Vessels v. Atlanta Independent School System, 408 F.3d 763, 767 (11th

Cir. 2005). If a prima facie case has been shown, then the defendant must "articulate some

legitimate, nondiscriminatory reason for the [adverse employment action]." McDonnell Douglas,

411 U.S. at 802; see Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1264 (11th Cir.

2010)  The defendant's burden is one of production; it need not persuade the court that it was

actually motivated by the proffered reasons. See Chapman v. A1Transport, 229 F.3d 1012, 1024

(11th Cir. 2000) (internal citations and quotations omitted); see also Alvarez, 610 F.3d at 1264.

     If the defendant satisfies the burden of production, the plaintiff has the opportunity to

---

     [8] Both Title VII and section 1981 have the same requirements of proof and use the same analytical framework with respect to disparate treatment claims. See Standard v. A.B.E.L. Svcs., Inc., 161 F.3d 1318, 1380 (11th Cir. 1998). With respect to the FCRA, Florida courts apply Title VII caselaw when they interpret the FCRA.  See Jones v. United Space Alliance, L.L.C., 494 F.3d 1306, 1310 (11th Cir. 2007)

come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment action. See Chapman v. A1Transport, 229 F.3d 1012, 1024 (11th Cir. 2000); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."); Alvarez, 610 F.3d at 1264 ("[s]howing only that the employer's proffered reason is false does not necessarily entitle a plaintiff to get past summary judgment.")

A plaintiff establishes a prima facie case by showing that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job. Burke-Fowler v. Orange County, Fla. 447 F.3d 1319, 1323 (11th Cir. 2006);  Rice-Lamar v. City of Ft. Lauderdale, Fla., 232 F.3d 836, 842-43 (11th Cir. 2000).

Defendant moves for summary judgment, claiming that Plaintiff cannot establish that she was treated differently than similarly situated employees outside her protected class. With respect to this element of the prima facie case, the plaintiff must show that " 'the employees are similarly situated in all relevant aspects . . . In determining whether employees are similarly situated . . . it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'" Knight v. Baptist Hosp., Inc., 330 F.3d 1313, 1316 (11th Cir. 2003) (per curiam) quoting Holifield, 115 F.3d at 1562; see also Burke-Fowler,

447 F.3d at 1323 (it is required that the quantity and quality of the comparator's conduct be nearly identical); Osram Sylvania, Inc. v. Teamsters Local Union 528, 87 F.3d 1261, 1265 (11th Cir. 1996) ("Disparate treatment exists when similarly situated workers are treated differently even though they have committed similar acts."); Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1186 (11th Cir. 1984) ("If an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown.") (citations and internal quotations omitted).

Plaintiff contends that Susan Denson, Horace Atkins and Stephanie Miquelli were similarly situated Caucasian nurses who were not disciplined for violating the hospital's A+ standard violations.  (Resp. at 14-15.)  With respect to Atkins and Miquelli, Plaintiff relies solely on her declaration for evidentiary support and, with respect to Denson, she relies on her declaration in part.  For example, regarding Denson, Plaintiff states she "recalled conversations she had with [Denson] in regards to a complaint by patients against all the nursing staff . . . because she had been implicated in the complaint" and Denson informed Plaintiff that "she had not been disciplined for this complaint." (Alvarado Decl. ¶ 3-4.)  Likewise, Plaintiff's declaration states that "one of the patient advocates talked to me about Miquelli . . . about complaints about Miquelli: they explained she was rude and condescending; the patients were complaining that she was extremely rude. . . [she] was never disciplined." (Alvarado Decl. ¶ ¶ 7-8.)  Lastly, with respect to Atkins, Plaintiff's declaration asserts he "was implicated in another complaint . . . [he] did not get disciplined when he received patient complaints. . . [He] had a physical altercation with a co-worker but was never disciplined." (Alvarado Decl. ¶ 5.)

What Plaintiff was told by another to prove the truth of the matter asserted is

22

inadmissible hearsay and as such is inadequate to show disparate treatment. Fed. R. Evid. 801(a),
(b) and (c); see Alvarez, 610 F.3d at 1268 n.10 (the plaintiff's testimony about what she heard
secondhand is inadmissible hearsay which cannot be used to defeat summary judgment). Nor do
these statements fall within any hearsay exception. Fed. R. Evid. 803, 804, 807; see Macuba v.
DeBoer, 193 F.3d 1316, 1323 (11th Cir. 1999) ("[A] district court may consider a hearsay
statement in passing on a motion for summary judgment" only if "the out-of-court statement
made to the witness. . .[would be] admissible at trial for some purpose.").   Furthermore, the
statements that are not rank hearsay lack Plaintiff's personal knowledge and therefore cannot be
used to defeat summary judgment. See Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 999
(11th Cir. 1992) (summary judgment appropriate when the record contains no evidence by any
person with personal knowledge); cf. Bald Mountain Park Ltd. v. Oliver, 863 F.2d 1560, 1563
(11th Cir. 1989) ("Mere conclusions and unsupported factual allegations are legally insufficient to
create a dispute to defeat summary judgment."); Evers v. Gen. Motors Corp., 770 F.2d 984, 986
(11th Cir. 1985) ("[C]onclusory allegations [in an affidavit] without specific supporting facts have
no probative value."); see also Fed. R. Civ. P. 56(e) ("[a] supporting or opposing affidavit must
be made on personal knowledge").

     The remaining evidence relied upon by Plaintiff does not serve to establish a prima facie
case of disparate treatment either.  For example, Plaintiff references the July 22, 2008 Patient
Complaint/Grievance Action Form and states that "Denson was involved in the incident whereby
the patient ripped out all the IV[s] and his insulin was dripping on the floor. . . while [Plaintiff]
was disciplined for this incident, despite the fact that she herself was not involved in the insulin
incident, she was disciplined and [Denson] was not." (Resp. at 14.)   The patient grievance,

23

however, does not support Plaintiff's interpretation of this incident.  Instead, the grievance stated

that the complainant was pleased with the nursing care her father had been receiving from

[Denson].  With respect to the insulin dripping on the floor, the complainant specifically noted

that the patient ripped out his IVs but the complainant "doesn't blame anyone for this."  (July 22,

2008 Patient Complaint/Grievance Action Form.)

   Plaintiff also cites to the deposition testimony of Ms. Newton, a patient's advocate at the

hospital.  The testimony highlighted by Plaintiff merely references Ms. Newton's statements that

the most common complaint lodged against nurses concerns personality and that, with respect to

a patient complaint against Plaintiff, other nurses were implicated.  However, Ms. Newton did

not know whether these other nurses were disciplined. (Resp. at 15 citing Newton Dep. at 26,

59.)  Ms. Newton also testified that a grievance was filed against a nurse for hitting a patient, but

she did not know what happened to that nurse. (Newton Dep. at 60.)   This testimony is entirely

unhelpful in establishing Plaintiff's prima facie case.  After all, Ms. Newton's testimony does not

provide the names of these nurses, what time periods they worked in the hospital, who supervised

them, their responsibilities, or the number of complaints they received.  In other words,

Plaintiff's evidence fails to show that she was terminated for conduct nearly identical to conduct

engaged in by non-Hispanic nurses. See Silvera v. Orange County School Bd., 244 F.3d 1253,

1259 (11th Cir. 2001) ("in order to satisfy the similar offenses prong, the comparator's

misconduct must be nearly identical to the plaintiff's in order to prevent courts from

second-guessing employers' reasonable decisions and confusing apples with oranges.") quoting

Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir.1999) (internal citation and quotation

marks omitted).  The failure to identify incidents involving the same conduct with the same

supervisor regarding a similar work rule is fatal to establishing a prima facie case.  See id. ('[t]he most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed"); Hawkins v. Ceco Corp., 883 F.2d 977, 985 (11th Cir. 1989) (disciplinary measures given for violation of different work rules not comparable).[9]

Nonetheless, Plaintiff advances another theory; namely, that a prima facie case that does not fit neatly into the McDonnell Douglas framework may be established by demonstrating "any proof of actions taken by the employer" that shows a "discriminatory animus" where "in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." (Resp. at 7-8 citing Coar v. Pemco Aeroplex, Inc., 372 Fed. Appx. 1, 3 (11th Cir. Feb. 25, 2010 relying on Shoenfield v. Babbitt, 168 F.3d 1257, 1268 (11th Cir. 1999).  In support, Plaintiff points to evidence she claims demonstrates that Ms. Durbin discriminated against her at Delray Medical Center, that Plaintiff's record was excellent prior to Ms. Durbin's arrival at the hospital, and that the allegations of Plaintiff's wrongdoing are not substantiated by Plaintiff's performance evaluations and promotions.  (Resp. at 8-13.)

This evidence, however, does not rise to the level the court in Shoenfeld found legally sufficient.  In Shoenfeld, the record was replete with evidence that "gender was a factor in [the plaintiff's] rejection," including testimony that hiring officials "felt pressured . . . to hire the female applicant.  Id.[10]  None of the evidence highlighted by Plaintiff allows this Court or a

---

[9] Throughout Plaintiff's response, she accuses Defendant of having produced incomplete records, and she notes that she concurrently filed a motion to compel. The motion to compel was denied on October 1, 2010 (DE 40.)

[10] Coar held that it could not conclude that the district court erred in determining that the plaintiff's other circumstantial evidence was insufficient to convince a jury that the defendant acted with discriminatory animus when he terminated the plaintiff. Coar, 372 Fed. Appx. at 3.

reasonable trier of fact to infer discriminatory animus.  <u>Contra</u> <u>Damon v. Fleming Supermarkets</u> <u>of Florida, Inc.</u>, 196 F.3d 1354, 1362 (11th Cir. 1999) (remark that employer wanted "aggressive, young men" to be promoted is "highly suggestive circumstantial evidence from which a jury could infer discriminatory animus");<u>Ross v. Rhodes Furniture, Inc.</u>, 146 F.3d 1286, 1291 (11th Cir. 1998) (comment by decisionmaker  that "I have never seen as many blacks in this building except in a Tarzan movie" is circumstantial evidence of the decisionmaker's discriminatory attitude when read in conjunction with the entire record and supports the jury's rejection of the defendant's proffered explanation for firing the plaintiff); <u>Alphin v. Sears, Roebuck & Co.</u>, 940 F.2d 1497, 1499 (11th Cir. 1991) (finding remark by supervisor to the plaintiff that he had "been around too long and [was] too old and [was] making too much money" immediately after a "corrective interview" to be circumstantial evidence of age discrimination and was sufficient to establish a prima facie case).  Indeed, Plaintiff fails to point to any evidence in which Plaintiff's race or national origin or the race or national origin of any other nurses is even mentioned.   Nor does the evidence upon which Plaintiff relies raise a genuine issue of material fact as to whether Defendant treated similarly situated employees outside of her protected class more favorably than she was treated.

Because the record is devoid of facts upon which a reasonable juror could find that Plaintiff has identified a similarly situated employee who was treated more favorably, or that Plaintiff has pointed to evidence of discriminatory animus, Plaintiff has failed to raise a genuine issue of material fact in support of a prima facie case of discrimination.

Although the Court has concluded that Plaintiff has failed to set forth a prima facie case, the Court will, for the purpose of a complete record, examine whether Defendant is able to state a

legitimate, non-discriminatory reason for its demotion and eventual termination of Plaintiff. According to Defendant, "Plaintiff's job was to perform quality patient care and to communicate effectively with patients, family members, and her peers, and she knew that compliance with the standards was a condition of her employment." (Mot. at 8; see also Alvardo Dep. 24-26, 44-45.) Defendant notes that it repeatedly received complaints from patients, patients' family members and nurses about Plaintiff's poor treatment of them.  (Cooper Decl. ¶ 6, 8-12; McKinney Aff. ¶ 5; Ex. 12, Patient Complaint/Grievance Action Form; March 20, 2008 Performance Evaluation; Korbar Decl. ¶ 3-4; July 22, 2008 Patient Complaint/Grievance Action Form; February 11, 2009 Patient Complaint/Grievance Action Form.)  Based on those complaints, Defendant undertook progressive discipline of Plaintiff, resulting in a demotion, suspension and a final warning.  (June 6, 2008 Progressive Disciplinary Action Form; Korbar Decl. ¶ 5; July 28, 2008 Progressive Disciplinary Action Form; September 5, 2008 Progressive Disciplinary Action Form; February 18, 2009 Progressive Disciplinary Action Form.)  Once Defendant received another complaint after the final warning, Defendant terminated Plaintiff. (February 11, 2009 Patient Complaint/Grievance Action Form; February 18, 2009 Progressive Disciplinary Action Form.) Based on this evidence, the Court finds that Defendant has met its burden of production with respect to establishing a non-discriminatory legitimate business reason for terminating Plaintiff. See Alvarez, 610 F.3d at 1267 (the defendant established a legitimate business reason for terminating the plaintiff when its proffered reason was that the plaintiff's performance was unsatisfactory).

     As such, the burden now shifts to Plaintiff to produce evidence that the multiple complaints Defendant received about her were not the reason for her termination, but instead is a

pretext for discrimination. Id. at 1264. To show pretext, Plaintiff "must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Id. at 1265 quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir.1997).  Plaintiff may satisfy this burden either "by offering evidence that [Defendant] more likely than not acted with a discriminatory motive, or by showing that its proffered reasons are not credible, unless the record conclusively shows that the real motive was a non-proffered reason that is non-discriminatory." Id.

Plaintiff argues that Defendant fabricated a "paper trail" to support her discipline and termination once Ms. Durbin commenced her employment with Defendant, that she was a good nurse, and other similarly situated nurses engaged in patient mistreatment and were not disciplined.  The Court begins with Plaintiff's last point, noting, as discussed supra, that Plaintiff has failed to present sufficient evidence in support of her prima facie case to raise a genuine issue of material fact that she was treated differently than similarly situated employees outside her protected class.  Cf. Chapman, 229 F.3d at 1024 (at the pretext stage, "the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."). Moreover, while there is record evidence that Plaintiff's prior performance evaluations from years before her termination reflected that she was a skilled nurse who was even promoted to a charge nurse position (2005 and 2006 Performance Evaluations), those earlier evaluations do not prove that the later complaints from patients, family members and other hospital employees were

28

not lodged against her or that her performance in the years just prior to her termination was satisfactory. See Cuddeback v. Fla. Bd. of Educ., 381 F.3d 1230, 1236 (11th Cir. 2004) (affirming grant of summary judgment for employer where employee had received highest possible rating in October 1999 and was terminated in May 2000; rejecting employee's pretext argument that was based on, inter alia, alleged "abrupt change in [supervisor's] opinion of her performance, the lack of any convincing explanation for the sudden negative view of her performance, [and] lack of any meaningful opportunity for her to improve any perceived deficiencies in her performance").

Finally, with respect to Plaintiff's allegations against Ms. Durbin, Plaintiff provides no evidence, other than her own belief, that Ms. Durbin discriminated against Plaintiff at her previous employment. Cf. Holfield, 115 F.3d at 1564 and n.6 (plaintiff's opinion that he felt discriminated against, without more, is not enough to establish a prima facie case of race discrimination); Evers, 770 F.2d at 986 (conclusory allegations without specific supporting facts have no probative value). Nor does the evidence support Plaintiff's contention that "[a]t no times before Durbin came alone was she ever cited, reprimanded or disciplined about her alleged and serious shortcomings as an RN." (Resp. at 25.)  To the contrary, the record shows that prior to Ms. Durbin's appointment as executive director in May of 2008, Ms. Cooper had received complaints about Plaintiff from other nurses and had been placed on a written warning for tardiness.  (Cooper Decl. ¶ ¶ 4-5; Alvarado Dep. 62-63;  November 11, 2005 Progressive Disciplinary Action Form.)  Furthermore, a complaint was filed against Plaintiff in February of 2007.  (Cooper Decl. ¶ 9; February 26, 2007 Patient/Grievance Action Form.)  Most significantly, Plaintiff has not produced any evidence demonstrating that several of the patient

29

complaints, lodged after Ms. Durbin's appointment but written up by patient advocates and not

her supervisors, were fabricated. (July 22, 2008 Patient Complaint/Grievance Action Form;

February 11, 2009 Patient Complaint/Grievance Action Form.)  In fact, one of these complaints

alleged that Plaintiff was so "rough" with a patient that he was banged into a bed rail. (February

11, 2009 Patient Complaint/Grievance Action Form.)

       For these reasons, the Court finds that Plaintiff has not met her burden of raising a

genuine issue of material fact that Defendant's legitimate, non-discriminatory reason was a

pretext for unlawful discrimination.  Accordingly, Defendant's motion for summary judgment is

granted with respect to Plaintiff's race and national origin disparate treatment claims.

       D. Retaliation

       To establish a prima facie case for retaliation, Plaintiff must show that 1) she engaged in

protected activity; 2) she suffered an adverse employment action and 3) there is some causal

relationship between her protected activity and the adverse employment action. See Alvarez, 610

F.3d at 1268; Holifield, 115 F.3d at 1566.  "To meet the causal link requirement, the plaintiff

`merely has to prove that the protected activity and the negative employment action are not

completely unrelated'" Holifield, 115 F.3d at 1566 quoting E.E.O.C. v. Reichhold Chemicals,

Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993).  However, "[t]he plaintiff must at least establish

that the employer was actually aware of the protected expression at the time the employer took

adverse employment action against the plaintiff." Holifield, 115 F.3d at 1566 citing Goldsmith v.

City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993); Weaver v. Casa Gallardo, Inc., 922 F .2d

1515, 1524 (11th Cir. 1991).  As with Plaintiff's discrimination claim, if Defendant articulates a

legitimate reason for its action, Plaintiff must "show that the employer's proffered reasons for

taking the adverse action were actually a pretext for prohibited retaliatory conduct." McCann v. Tillman, 526 F.3d 1370, 1375 (11th Cir. 2008) quoting Sullivan v. National R.R. Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999).[11]

According to Plaintiff, her June 10, 2008 letter to Ms. Hilsenbeck[12] was a protected activity based on her statement "I believe I was being discriminated against." (Resp. at 22.)  With respect to the adverse employment actions, Plaintiff points to her second suspension and termination as retaliatory acts.  Defendant, however, states that this letter does not constitute statutorily protected activity and, even if there was close proximity between the protected activity and the adverse employment activity, Plaintiff's poor treatment of patients and family members was an intervening act which severed any inference of causation.  Defendant also contends that Plaintiff's Title VII retaliation claim is barred based on her failure to include that claim in her EEOC charge.

Even assuming that Plaintiff's Title VII retaliation claim is not barred, and Plaintiff can establish a prima facie case of retaliation, summary judgment would still be appropriate on the retaliation claim.  As discussed supra, Defendant has presented a legitimate, non-discriminatory business reason to discipline and ultimately terminate Plaintiff; namely, Plaintiff's repeated violation of hospital policy.  Cf. Alexander v. Fulton County, Ga., 207 F.3d 1303, 1341 (11th

─────────────────────

[11] "Whether the elements of Title VII and section 1981 retaliation claims are the same is an 'open question' in this Circuit. Bass v. Board of County Comm'rs, Orange County, Fla. 256 F.3d 1095, 1120 n.10 (11th Cir. 2001).  Given that neither party objects to the application of Title VII framework, the Court chooses to apply this law to Plaintiff's race-based retaliation claim.

[12] In her response memorandum, Plaintiff provides an incorrect date for this letter and an incorrect citation. However, based on the quote from the letter, the Court has determined Plaintiff is referring to the Hilsenbeck letter.

Cir.2000) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated."); Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir.1991) (Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions.").  Nor has Plaintiff shown that Defendant's reasons for its actions were pretextual.  See Silvera, 244 F.3d at 1261 (pretext means "a lie, specifically a phony reason for some action").

E.  Hostile Work Environment

A prima facie hostile work environment claim requires proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).  To prove a hostile work environment claim, an employee must demonstrate that 1) she belongs to a protected group; 2) she has been subject to unwelcome harassment; 3) the harassment was based on a protected characteristic of the employee; 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create an abusive working environment and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability. Id.; see Mendoza v. Borden, Inc., 195 F.3d 1238 (11th Cir. 1999).  The Court looks at the totality of the circumstances to decide whether the harassing conduct is sufficiently severe or pervasive enough to alter the terms and conditions of employment and create an abusive working environment.  Mendoza, 195 F.3d at 1246.

According to Plaintiff's response memorandum, her hostile work environment claim is

32

based on Ms. Durbin creation of a "paper trail of wrongdoing against Plaintiff," "endless

accusations" and reprimands and discipline by supervisors.  (Resp. at 19-21.)  Even taking these

facts as true, such behavior does not establish a hostile work environment.  A hostile work

environment claim "centers on discriminatory intimidation, ridicule, and insult." McCann v.

Tillman, 526 F.3d 1370, 1379 (11th Cir. 2008) citing Nat'l R.R. Passenger Corp. v. Morgan, 536

U.S. 101, 117 (2002) (differentiating hostile work environment claims from claims involving

patterns of discrimination which constitute "discrete acts that must be challenged as separate

statutory discrimination and retaliation claims"); see also Miller v. Kenworth of Dothan, Inc.,

277 F.3d 1269, 1276 (11th Cir. 2002) ("it is repeated incidents of verbal harassment that continue

despite the employee's objections [that] are indicative of a hostile work environment"); Edwards

v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995) quoting EEOC v. Beverage

Canners, Inc., 897 F.2d 1067, 1068 (11th Cir. 1990) (to establish hostile work environment, the

plaintiff needed evidence that racial slurs allegedly spoken by co-workers were so

"commonplace, overt and denigrating that they created an atmosphere charged with racial

hostility.").  Here, Plaintiff's hostile environment claim is merely a recycling of her race and

national origin disparate treatment claims and is therefore improper.  See Cowan v. Prudential

Ins. Co. of Am., 141 F.3d 751, 759 (7th Cir. 1998) (claim that male employees were treated better

than female employees is a claim of outright discrimination, not hostile work environment);

Bialock v. Dale County Bd. of Educ., 84 F. Supp. 2d 1291, 1305 (M.D. Ala. 1999) (same).  As

such, Defendant's motion for summary judgment is granted with respect to the hostile work

environment claim.

F.  Age Discrimination Claim

In order to prevail in a claim for age discrimination by the use of circumstantial evidence, Plaintiff must establish that she was "1) a member of the protected class; (2) qualified for the position; (3) subjected to adverse employment action; and (4) replaced by a person outside the protected class or suffered from disparate treatment because of membership in the protected class." Kelliher v. Veneman, 313 F.3d 1270, 1275 (11th Cir. 2002).  Once established, Defendant need only show a legitimate, non-discriminatory reason for the challenged employment action. Id.  At that point, Plaintiff must demonstrate that this reason is pretextual.  Id.

Plaintiff contends that both Ms. Durbin and Ms. Korbar made comments to her "which she perceived were attacking her age and stamina." (Resp. at 18-19.)  Furthermore, Plaintiff states that "other older nurses were being let go" and the "unit was being filled with younger nurses," thereby allowing for the inference that the hospital was attempting to rid itself of older nurses.  Finally, Plaintiff notes that two nurses, including Maria Duque, were summarily terminated.  (Resp. at 19.)  Noticeably absent from Plaintiff's response memorandum is any citation to record evidence to support her contention regarding what comments were allegedly made by Ms. Durbin and Ms. Korbar.  For that reason alone, this argument can be disregarded with respect to Plaintiff establishing a prima facie case.

Furthermore, Plaintiff's statement that she observed older nurses being let go is presumably based on the portion of her declaration which states, "I also noticed that many other older nurses were being terminated.  I know that some older and Hispanic nurses  . . .were terminated under circumstances giving rise to unlawful motives." (Alvarado Decl. ¶ 18.) This statement, however, lacks personal knowledge and must therefore be disregarded. See

<u>Tipton</u>, 965 F.2d at 999 (11th Cir. 1992); <u>cf.</u> <u>Bald Mountain Park Ltd.</u>, 863 F.2d at 1563 (11th Cir.

1989); <u>Evers v. Gen. Motors Corp.</u>, 770 F.2d at 986 (11th Cir. 1985); <u>see</u> <u>also</u> Fed. R. Civ. P.

56(e) ("[a] supporting or opposing affidavit must be made on personal knowledge").

      Next, Plaintiff states that "[s]ome of the other nurses who were summarily terminated and

who were older than 50 were Maria Duque and Vivienne Casertas" and cites the declaration of

Maria Duque. (Resp. at 19.)  Significantly, Defendant has filed a motion to strike the Duque

Declaration on the basis that it was not filed with her response memorandum and therefore not

within the deadlines established by the Court. <u>See</u> S.D. Fla. L.R. 7.1(c)(3).  Furthermore,

Defendant points out that the declaration does not comply with 28 U.S.C. § 1746.[13]  Plaintiff

does not deny that the declaration was belatedly filed or that it does not comply with 28 U.S.C. §

1746.  (DE 29 at 2-3.)  For these reasons, the Court will strike the declaration.

---

[13] The pertinent part of this statute follows:

Unsworn declarations under penalty of perjury

Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

(1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).

28 U.S.C. § 1746.

However, even if the declaration was not stricken, the declaration does not raise a genuine issue of material fact.  The portion of the declaration upon which Plaintiff appears to rely is the following:

> During my tenure at [the hospital], I observed many older nurses, especially the ones who were close to having their pensions vested, systematically terminated.  These nurses performed their jobs well for many years. Then, out of the blue, they would be subjected to accusations of "wrongdoing" which, historically, would not be sufficient grounds for termination. Further, the types of "wrongdoing" cited commonly are done by nurses from time to time as it is impossible to be perfect in every respect in this occupation.

 (Duque Decl. ¶ 2.)

Ms. Duque's "observations" regarding other nurse's terminations are nothing more than "conclus[ory] and unsupported factual allegations [that] are legally insufficient to defeat a summary judgment motion." Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005).  Clearly, these statements are based on information and belief and therefore do not a raise a genuine issue of material fact.  Id.   With respect to facts within Ms. Duque's personal knowledge, the declaration includes the statement "I was able to avoid termination until just after my pension was vested." (Duque Decl. ¶ 5.)  Of course, this statement does not serve to support a finding of age discrimination. If anything, this statement suggests Defendant did not make an age-based decision.

Finally, as discussed supra, Plaintiff has failed to demonstrate that Defendant's proffered legitimate, non-discriminatory business reason was pretextual.  As such, there are no material issues of fact on the age discrimination claim and the Court will grant summary judgment on this claim.

IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1)      Defendant Boca Raton Community Hospital's Motion for Summary Judgment

        (DE 14) is **GRANTED**.

2)      Defendant's Motion to Strike Declaration of Maria Duque (DE 35) is

        **GRANTED**.

3)      The Court will separately enter judgment for Defendant.

        **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 6th  day of October, 2010.


                                  _____
                                  KENNETH A. MARRA
                                  United States District Judge